Todd M. Schneider
Matthew S. Weiler
J. Caleigh Macdonald
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
MWeiler@schneiderwallace.com
JMacdonald@schneiderwallace.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

---

ANDREA CROOK, *individually and on behalf of all others similarly situated*,

Plaintiff,

*v.*

REALPAGE, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LINCOLN PROPERTY CO.; FPI MANAGEMENT, INC.; MID-AMERICA APARTMENT COMMUNITIES, INC.; AVENUE5 RESIDENTIAL, LLC; EQUITY RESIDENTIAL; ESSEX PROPERTY TRUST, INC.; THRIVE COMMUNITIES MANAGEMENT, LLC; and SECURITY PROPERTIES INC.,

Defendants.

---

Case No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

CLASS ACTION COMPLAINT -1-
Case No. _____

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

PARTIES .................................................................................................... 3

JURIDICTION AND VENUE ................................................................... 5

FACTUAL ALLEGATIONS ..................................................................... 6

  A.   The market for multifamily residential real estate leases .................................. 6

  B.   Historically, price competition was the prevailing strategy among Lessors. ................... 7

  C.   Lessors eliminated competition by delegating their independent price and supply decisions to a common decision maker, RealPage. ........................................... 7

  D.   The cartel artificially inflated prices and reduced occupancy (output) of residential real estate leases. ................................................................................. 10

  E.   The market is susceptible to the formation and maintenance of a successful cartel......... 12

CLASS ACTION ALLEGATIONS .......................................................... 14

COUNT ONE............................................................................................. 15

PRAYER FOR RELIEF ............................................................................ 16

JURY DEMAND ....................................................................................... 17

**INTRODUCTION**

1.      A cartel of lessors ("Lessors") has artificially inflated prices in the multifamily real estate market in the United States.  Historically, Lessors priced their units independently to maximize occupancy (*i.e.*, maximize output), and were incentivized to reduce prices to attract lessees away from competitors until complete occupancy ("heads-in-beds" strategy).  This competitive process drove rent levels to reflect natural market supply and demand of rental units.  Lessors also determined when to market a unit independently, which led to unstable supply levels (a natural feature of a competitive market).  And when supply exceeded demand, Lessors cut rent prices.

2.      The historical approach presented Lessors with a "a classic prisoner's dilemma," from the view of a former industry executive, because although all Lessors "would be better off limiting their rent reductions," if any "lower[ed] their rents while the others don't, then that [one] would outperform" the others.

3.      Lessors solved the natural prisoner's dilemma by replacing independent pricing and supply decisions with collusion that is organized and facilitated by RealPage,  Inc. ("RealPage"), a company that offers software and data analytics to the real estate industry.  Starting in 2016 (or earlier), Lessors agreed to provide RealPage with real-time, competitively sensitive price and supply data that RealPage then feeds into its centralized pricing algorithm that provides cartel members with unit-specific price and supply recommendations.  Lessors adhere to RealPage's price recommendations because they know that other Lessors will do the same.

4.      By sharing non-public sensitive information and following RealPage's algorithmic price and supply decisions, Lessors have avoided the price competition natural to the market and increased (artificially) residential lease prices.  As it advertises, RealPage "balance[s] supply and demand to maximize [Lessors'] revenue growth."  RealPage maximizes revenue for Lessors in at least two unlawful ways.

5.      ***First***, Lessors "outsource daily pricing and ongoing revenue oversight" to RealPage, *i.e.*, they replace many independent decision makers with one.  Lessors provide, and RealPage collects, historical and live pricing data from more than **13** million units (a "very large chunk of the total inventory in the country," according to RealPage), which is updated every time Lessors make or

change a lease offer. RealPage standardizes the raw collected data to account for the characteristics or "class" of a given property, and then sets prices for participating Lessors using a common formula. RealPage asserts that it centrally prices the Lessors' "properties as though we own them ourselves." Put differently, the cartel achieves the market effects of a monopolist (any cartel's design).

6.     Adherence to the scheme is ensured by RealPage, which commands that Lessors must be "disciplined" and accept at least 80-percent of RealPage's price recommendations for its services to be effective. Participating Lessors adopt as many as 90- (and at least 80-) percent of RealPage's prices without deviation. One Lessor explained that while Lessors are "technically competitors," RealPage helps them "to work with a community in pricing strategies, not to work separately."

7.     **Second**, Lessors coordinate supply levels through RealPage to avoid price competition. In a competitive rental market, lease supply exceeds demand at times, which creates downward price pressure as firms compete to attract lessees. To avoid such competition, RealPage provides Lessors with information sufficient to "stagger" lease renewals to avoid an oversupply in the market, which causes Lessors to hold units vacant for periods of time (*contra* the historical heads-in-beds strategy) so that, collectively in the market, there is never a period of oversupply of available units, artificially maintaining and inflating prices. And by staggering lease renewals to artificially curb supply, the cartel eliminates incentive to cheat on price, avoiding a race to the bottom (or return to the natural prisoner's dilemma). To this end, RealPage educates Lessors that they must sacrifice "physical occupancy" (*i.e.*, decrease output) for "economic occupancy" (RealPage's term for increasing prices using artificial scarcity).

8.     The cartel's efforts have caused anticompetitive effects in the form of higher prices and reduced output (occupancy). RealPage advertises that participating Lessors experience year-over-year rent price increases "between 5% and 12% in every market." Indeed, a RealPage Vice President said in a marketing video that he thought RealPage's software was "driving" recent, never-before seen price increases for residential real estate leases (up to 14.5%). Lessors are happy with the program: one, for example, made "10 million in income" by raising rents and "pushing people out" of leases they could no longer afford.

9.     The conspiracy here alleged violates Section 1 of the Sherman Act. Plaintiff brings this

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

1  action to recover its damages, trebled, as well as injunctive and other appropriate relief, detailed infra,

2  on behalf of all others similarly situated.

3  **PARTIES**

4  10.    Plaintiff Andrea Crook ("Plaintiff") is a citizen and resident of the State of Tennessee.

5  Plaintiff rented a multifamily residential unit in a property managed by Defendant Mid-America

6  Apartment Communities, Inc. located in Memphis, Tennessee.  Plaintiff has paid and will continue to

7  pay higher rental prices because of the anticompetitive conduct alleged herein.

8  11.    Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson,

9  Texas.  RealPage has thousands of employees and earns more than a billion dollars in revenue annually

10  providing software and services to the residential real estate industry.  RealPage had nearly 30,000

11  clients at the end of 2019, including the ten largest multifamily property management companies in

12  the United States.  RealPage was a public company until December 2020 when private equity firm

13  Thoma Bravo purchased the corporation at a valuation of approximately $10.2 billion.

14  12.    Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware LLC

15  headquartered in Charleston, South Carolina.  It is the largest manager of multifamily rental real estate

16  in the United States, with more than 782,900 units and student beds under management nationally.

17  On information and belief, Greystar earns billions of dollars in revenue annually, controls $35.5 billion

18  dollars in assets, and employs over 20,000 people.

19  13.    Lessor Defendant Lincoln Property Co. ("Lincoln") is a Texas corporation

20  headquartered in Dallas, Texas.  Lincoln is the second largest manager of multifamily rental real estate

21  in the United States, managing over 210,000 multifamily units under management nationally.  On

22  information and belief, Lincoln earns billions of dollars per year in revenue and employs thousands of

23  people.

24  14.    Lessor Defendant Cushman & Wakefield, Inc. ("Cushman") is a Delaware corporation

25  headquartered in New York, New York.  It is the third largest commercial real estate services firm in

26  the world and third largest property manager of multifamily rental real estate in the United States.

27  Through its subsidiary, Pinnacle Property Management Services, LLC ("Pinnacle"), which is

28  headquartered in Addison, Texas, Cushman manages more than 170,000 units across 32 states,

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

1  Washington D.C., and Canada.  Cushman and Pinnacle use RealPage Software to artificially raise the

2  rental prices of multifamily residential property leases.

3       15.    Lessor Defendant FPI Management, Inc. ("FPI") is a California corporation

4  headquartered in Folsom, California.  FPI is the fifth largest manager of multifamily rental real estate

5  in the United States, with over 150,000 multifamily units under management in 17 states.   On

6  information and belief, FPI earns billions of dollars per year in revenue and employs thousands of

7  people.

8       16.    Lessor Defendant BH Management Services, LLC ("BH") is a Florida LLC

9  headquartered in Des Moines, Iowa.  BH is the eighth largest manager of multifamily rental real estate

10 in the United States, on information and belief, managing over 100,000 units and employing 2,600

11 people across the country. BH uses RealPage Software to artificially raise the rental prices of its

12 multifamily residential property leases.

13      17.    Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA") is a

14 Tennessee corporation headquartered in Germantown, Tennessee.  MAA is the tenth largest manager

15 of multifamily rental real estate in the United States, managing over 100,000 multifamily units across

16 16 states.  On information and belief, MAA earns over one billion dollars per year in revenue and

17 employs over 2,400 people.

18      18.    Lessor Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware LLC

19 headquartered in Seattle, Washington. Avenue5 is the twelfth largest manager of multifamily rental

20 real estate in the United States, with over 96,900 multifamily units under management in 12 states. On

21 information and belief, Avenue5 earns over $500 million dollars per year in revenue and employs over

22 one thousand people.

23      19.    Lessor Defendant Equity Residential ("Equity") is a Maryland real estate investment

24 trust headquartered in Chicago, Illinois. Equity is the sixteenth largest manager of multifamily rental

25 real estate in the United States, managing more than 80,000 units under management in eight states.

26 On information and belief, Equity earns over 2 billion dollars per year in revenue and employs over

27 2,000 people.

28      20.    Lessor Defendant Essex Property Trust, Inc ("Essex") is a Maryland corporation

headquartered in San Mateo, California. Equity is the twenty-fourth largest manager of multifamily rental real estate in the United States, with over 61,000 units under management in California and Washington. On information and belief, Essex earns over 1.4 billion dollars per year in revenue and employs over 1,700 people.

21. Lessor Defendant UDR, Inc. ("UDR") is a Maryland corporation headquartered in Highlands Ranch, Colorado. UDR has 53,229 units in 160 communities located in 21 markets under management in the United States. It is the 19th largest owner of apartments in the United States and the 30th largest apartment property manager in the United States. UDR uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

22. Lessor Defendant Thrive Communities Management, LLC ("Thrive") is a Washington LLC headquartered in Seattle, Washington. Thrive manages more than 18,000 units in the greater Pacific Northwest. On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people.

23. Lessor Defendant Security Properties Inc. ("Security Properties") is a Washington corporation headquartered in Seattle, Washington. Security Properties manages more than 22,000 units in eighteen states. On information and belief, Security Properties earns millions of dollars per year in revenue.

24. The "Co-Conspirators" are various persons and entities, including Lessors, known and unknown to Plaintiffs and not named as defendants in this action, who have participated as co-conspirators with RealPage and the Lessor Defendants in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

**JURIDICTION AND VENUE**

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15, 26). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. 1332(d) as this is a class action, the amount in controversy exceeds $5 million, and there exists minimal diversity.

26. This Court has personal jurisdiction over Defendants under Section 12 of the Clayton

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).  Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, (i) may be found in and transact business in the forum state, including the sale of multifamily residential real estate leases, and (ii) engage in interstate commerce in the sale of multifamily residential real estate leases.

27.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), as well as 28 U.S.C. § 1391, because one (or more) Defendant(s) maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and caused effects within this District.  Proceeding in the Western Division of this Court is appropriate under Local Rule 3.3(b) because there are multiple defendants and (*a*) at least one of them resides in the Division, and (*b*) Plaintiff's claim arose in this Division.

**FACTUAL ALLEGATIONS**

**A.    The market for multifamily residential real estate leases**

28.    The relevant product market is the market for the lease of multifamily residential real estate.  The relevant geographic market is the United States.

29.    Multifamily residential real estate (also known as multi-dwelling unit or MDU) is a housing classification where multiple separate residential housing units are contained within one building (or buildings within one complex) and includes apartments and condominiums.

30.    From consumers' perspective, multifamily residential units for rent are not economic substitutes for multifamily or single-family residences for purchase. Among a litany of reasons, there are high barriers to purchasing real estate, such as the ability to obtain financing and make a substantial down payment.  And single-family properties typically do not offer any amenities, security, or (repair and maintenance) services of a multifamily property.  Indeed, when discussing market trends and customers, industry participants distinguish between multifamily and single-family real estate, including pricing differences.

31.    The multifamily residential real estate lease market satisfies the "SSNIP test" for market definition, which asks whether a hypothetical monopolist could impose a small but significant (typically 5%) non-transitory increase in price (a "SSNIP"), without causing enough customers to substitute other products or services such that the SSNIP would be unprofitable to the monopolist.  If

the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market has been defined too narrowly, *i.e.*, it does not encompass sufficient economic substitutes.

32.     Here, the cartel has achieved price increases "between 5% and 12% in every market" without causing enough lessees to exit the market (and switch to another form of shelter) such that the price increases were unprofitable to Lessors. Thus, the SSNIP test is met and the market properly defined.

**B.     Historically, price competition was the prevailing strategy among Lessors.**

33.     Before RealPage, the multifamily residential real estate rental market functioned competitively. Then, Lessors "worship[ed] the occupancy gods," and learned that properties that were "not 95 percent-plus occupied" were "failing," according to an industry participant.

34.     Concerned about losing revenue each day a property was vacant, Lessors independently followed a "heads-in-beds" strategy, offering sufficiently attractive price terms to maintain maximum "physical occupancy" of their units. These "concessions" could come in the form of reduced prices, such as free rent for the first month. This strategy also minimized turnover costs associated with finding and evaluating new tenants.

35.     Lessors worshipped the occupancy gods and kept heads in beds through independent "manual" pricing of leases. Lessors maximized occupancy (output) by offering sufficiently low prices to attract tenants to enter or renew leases. This approach—a market-share-over-price strategy—is a defining characteristic of a competitive market.

**C.     Lessors eliminated competition by delegating their independent price and supply decisions to a common decision maker, RealPage.**

36.     Following RealPage's arrival, Lessors concertedly switched from their independent and competitive head-in-beds/market-share-over-price strategies to a collusive price-over-volume strategy (a hallmark of a cartelized market).

37.     The cartel employs a strategy of "economic occupancy," a term coined by RealPage to refer to the practice of increasing prices notwithstanding market conditions and tolerating any correlated reduction in physical occupancy.

38.     All Lessors are better off by limiting rent reductions (price discounts), so if any Lessor

lowers rent prices (gives discounts) while others do not, then that Lessor would "outperform" the others, "a classic prisoner's dilemma," according to a former industry executive.  With this dilemma in the background, maximizing "economic occupancy" is only in a firm's economic self-interest if many Lessors do the same.  Thus, if Lessors receive mutual assurances that other Lessors will not compete on price, the dilemma is solved, and the Lessors can maintain (profitably) artificially-high prices.

39.     The cartel has agreed not to compete on lease prices for multifamily residential real estate, providing Lessors the assurances needed for the courage to act against their economic self-interest.  The cartel has achieved artificially-inflated prices through two means: Lessors agree (1) to set prices through RealPage using a coordinated algorithm, and (2) to stagger lease renewal dates through RealPage to manipulate supply.

40.     Lessors outsource "daily pricing and ongoing revenue oversight" to RealPage, which uses a coordinated algorithm to price Lessors' "properties as if [RealPage] own[s] them," according to RealPage.  In other words, RealPage and the Lessors operate and function as a monopolist.

41.     Lessors agree to adhere to RealPage's coordinated algorithmic pricing, exhibiting pricing "courage" or "discipline," as they call it.  Lessors also agree to provide RealPage with live access to competitively sensitive, nonpublic data about their properties and leases.  This data covers more than **16** million units, a "very large chunk of the total inventory in the country," according to RealPage.

42.     RealPage standardizes the raw data provided by Lessors to normalize between properties with different characteristics, and then runs this massive dataset through its central pricing algorithm, which sets prices for Lessors by applying a common formula to the common dataset.

43.     RealPage encourages Lessors to have their employees speak daily with a RealPage "Pricing Advisor," and provides "approved pricing" levels to Lessors each morning.  Lessors typically "accept" or "confirm" the "approved pricing" within a certain time period by communicating with a Pricing Advisor.

44.     Lessors who want to deviate from the cartel-approved prices must submit their reasoning to RealPage for approval.  If there is disagreement between the Lessor's agent and the

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

Pricing Advisor, the dispute often elevates to the Lessor's management for resolution, and specific reasons justifying a departure from RealPage's pricing level are usually required.

45.    RealPage encourages discipline and adherence to the cartel's objectives by telling Lessors that they must adopt cartel-"approved pricing" at least 80% of the time for the coordinated pricing algorithm to be most successful in raising rents. These instructions are successful, with Lessor adoption of 80–90% of RealPage's prices.    The alternative is many "idiots" setting prices independently, which "costs the whole system," as RealPage's former Principal Scientist, Jeffrey Roper, put it.

46.    One Lessor explained that adhering to the coordinated strategy required counterintuitive changes to their business practices, such as not "offering concessions nor . . . negotiat[ing] pricing" as before, with the upside being that RealPage will "maximize rents but you have to be willing to strictly follow it."    Accordingly, they "rarely make any overrides to the recommendations."    Another Lessor described RealPage as bringing "discipline" and "courage to pricing."

47.    RealPage also aids Lessors to stagger lease renewals to avoid natural periods of oversupply that would persist in a competitive market using software it designed, applied to the common dataset provided by Lessors.  With RealPage, one Lessor explained, Lessors are "now able to stagger lease expirations throughout the month, effectively cutting down on frictional vacancy loss as well as concessions" on price.  Able to stagger lease renewals, that Lessor explained, Lessors "leveled the lease expirations throughout the year to better match the historical demand for each community, thus positioning [Lessors] for even higher rent growth."

48.    Lessors publicly boast that their concerted conduct with RealPage allowed them to raise and maintain higher prices in concert.  To wit, the previous Lessor (proud to manipulate supply), explained that while Lessors "are all technically competitors," their common adoption of and adherence to RealPage's software helps Lessors "work together" as "a community in pricing strategies, not to work separately."  Another Lessor boasted of "a substantial boost to economic occupancy" by participating in the cartel.

49.    By "outsourcing" pricing functions to RealPage, another Lessor explained, its prices

CLASS ACTION COMPLAINT -9-
Case No. _____

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

are set by RealPage's "experts" that function "like an extension of our team."

50.    Another found that "driving [] turnover rate up actually captured additional revenue," with the "net effect of driving revenue and pushing people out" worth about "$10 million in income," leading to the conclusion that "heads in the beds above all else is not always the best strategy."

51.    Given that Lessors face a natural prisoner's dilemma, rejecting that competitive heads-in-beds strategy would be in a Lessor's self-interest only if they are assured that rivals will not undercut them.  The cartel provides these assurances through RealPage, which allows for Lessors to reach a common understanding, effectuate that understanding, and coordinate supply and price levels.

**D.    The cartel artificially inflated prices and reduced occupancy (output) of residential real estate leases.**

52.    The cartel's coordinated use of RealPage's pricing algorithm has caused anticompetitive effects in the form of higher prices and reduced output. Indeed, a RealPage executive "think[s] it's" RealPage's software "driving [higher prices for residential real estate leases], quite honestly."

53.    RealPage advertises that cartel members experience "[r]ental rate improvements, year over year, between 5% to 12%," "outperform the market by up to 5%," and gain "an additional 150-200 basis points of hidden yield" unobtainable through independent pricing decisions (referred to by RealPage as "manual pricing").  RealPage claims to "outperform manual pricing" by 7% each year, *i.e.*, cartel prices are 7% above competitive levels.

54.    The cartel's price increases would be (*i*) economically irrational and against Lessors' self-interest if they acted independently without assurances that other Lessors would also exercise price "discipline," and (*ii*) unachievable without RealPage's pricing algorithm.  Statements from Lessors confirm as much.  For example:

- RealPage's "beauty . . . is that it pushes [Lessors] to go places that [they] wouldn't have gone on [their] own if [they] weren't using it," a Lessor's representative explained.

- Another told an industry conference that it "raised rents hundreds of dollars," following RealPage's pricing, and would not have had "the courage to push [rents] as aggressively as" RealPage.

- It is "not in [a Lessor's] DNA to raise pricing $150 to $200 per unit on a lease turn," but RealPage allows Lessor to do what they would not if pricing independently, according to another Lessor representative.

- Another Lessor "let the system push as hard as it would go, and [] saw increases as high as 20 percent. . . . Left to [its] own devices, [the Lessor] would have never pushed rents that hard. That was a big number."

- A consultant for a Lessor that successfully raised rents where market conditions dictated otherwise acknowledged that "[i]f you'd listened to your gut, you would have lowered your price."

55.    RealPage advertises that Lessors could not obtain these price levels independently: "We believe in overseeing properties as though we own them ourselves.  We believe we can deliver better results for you than you would otherwise be able to achieve."  Thus, RealPage concedes that its coordinated pricing algorithm allows Lessors to obtain the same results as a monopolist—an outcome Lessors "would not otherwise be able to achieve" without RealPage's pricing and other cartel members' assurances of adhering to that pricing.

56.    For example, at the beginning of the Covid-19 pandemic, many Lessors "initial reaction, was, 'oh I need to start dropping rent, I need to start giving concessions'" to account for the exodus of renters from metropolitan areas, but RealPage's "advisory team and the product did a great job" of resisting that natural competition, according to a RealPage V.P. of Revenue Management. Another RealPage employee confirmed, observing "unbelievable resilience" and "discipline in pricing through the worst of the downturns . . . a lot of people thought we'd see severe rent cuts; that just didn't happen."  Such "resilience" and "discipline" is "unbelievable" because it is against a Lessor's economic self-interest absent assurance that rival Lessors will not compete on price.

57.    RealPage knows its conduct is illegal.  One of the main architects of RealPage's pricing software, Jeffery Roper, was Director of Revenue Management at Alaska Airlines in the 1980s when Alaska and other airlines used common software to share nonpublic route and price information to head off price competition.  Eventually, Alaska and seven other airlines settled claims of price-fixing violations with the U.S. Department of Justice.  Federal agents seized Roper's computer and documents during the investigation, who claims he "had no idea" at the time that colluding with competitors was unlawful.  Despite learning that such collusion is unlawful, Roper then brought a similar coordinated pricing strategy to residential real estate leasing through RealPage.

**E.    The market is susceptible to the formation and maintenance of a successful cartel.**

58.    Numerous "plus factors" render the market for the sale of multifamily residential real estate leases susceptible to the formation and maintenance of a successful cartel.  These factors include high entry and exit barriers, market concentration, inelastic demand, relatively fungible products (residential leases), exchanges of competitively sensitive information among horizontal competitors, and opportunities to collude at industry and RealPage events.

59.    *Entry barriers:* property owners and operators face substantial barriers to entry, including high costs to acquire property and establish a property management infrastructure, as well as continuing maintenance and regulatory compliance costs.  Indeed, acquisition costs for even small multifamily rental properties exceed millions of dollars.  And large properties can cost hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire.  Faced with high entry costs, new market entrants are not likely to undercut and discipline cartel pricing.

60.    *Exit barriers:* lessees face high exit barriers in the form of substantial costs, life disruptions, and inconvenience, *inter alia*, when moving between apartments (if they can find a new one after being priced out of their old residence).  Where price escalation has run rampant, renters may not have a lower-priced (or even affordable) option within reasonable proximity to their current residence.  In other words, renters are at the mercy of the cartel and cannot turn to the rest of the market to discipline cartel pricing.

61.    *Inelastic demand:* the demand for multifamily residential real estate property leases is relatively inelastic.  The only realistic alternative to renting is buying.  For most renters, buying real property is not an option for reasons financial or otherwise.  Thus, no reasonable substitute exists to discipline cartel pricing.

62.    *Fungible product:* multifamily residential real estate properties are relatively fungible, especially when controlling for a property's "class" (*i.e.*, certain high-level characteristics, such as the number of bedrooms and bathrooms, amenities, location, or age of the building).  Accordingly, according to Lessors, RealPage's algorithm can analyze "like" properties, providing Lessors a true

"apples to apples" comparison between (formerly) competitor properties.

63.    **Information exchange:** RealPage is a conduit through which Lessors directly share competitively sensitive information with each other.  In addition to setting lease prices and supply levels for the cartel, RealPage uses its real-time, non-public data feed to create benchmarking reports that allow Lessors to compare readily their price and occupancy performance against the industry. RealPage's benchmarking reports rely on its live, private data stream, and cannot be replicated using public data because advertised lease rates typically diverge from actual rates.

64.    **Market concentration:** the residential real estate property lease market is highly concentrated.  Most major metropolitan areas are dominated by relatively few sellers, and many large players have substantial presences in metropolitan areas throughout the United States.

65.    **Collusion opportunities:** there are many opportunities for RealPage and Lessors to collude in person and online.

66.    Online, for example, the "RealPage User Group Forum" is a private association of about one thousand Lessors that RealPage operates to "promot[e] communication between [Lessors]" and "improve communications between RealPage and the [Lessors.]"  The Forum's "Idea Exchange" is a platform for Lessors to suggest improvements to RealPage and give feedback about potential software changes.  And some Lessors are invited by RealPage to a "Steering Committee," which is directed by RealPage to promote "the mutual benefit of all users [Lessors]," and tasked with consulting other Forum subcommittees to learn of other Lessors' suggestions for RealPage.

67.    "RealWorld" is an annual, multi-day conference organized by RealPage where Lessors, RealPage executives, and partners network, discuss industry news, insights, and initiatives, and learn about using RealPage's collusive tools.  Most recently, RealWorld took place in Las Vegas, NV (2018 and 2022), Orlando, FL (2019), Nashville, TN (2021), and online in 2020 because of Covid.

68.    Lessors also attend periodic "summits" hosted by RealPage to discuss RealPage's pricing software with RealPage and each other.  Summit discussion topics have included: (*a*) "Competitive Rent Analysis," *i.e.*, "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing"; (*b*) "Supply Forecasts" and "Demand Forecasts"; and (*c*) RealPage's "Pricing Engine," *i.e.*, "[m]ethods to price units in real time

based on statistically validated price elasticity models."

69.    Further, industry trade associations offer additional opportunities to conspire.  For example, the National Multifamily Housing Council ("NMHC") —whose sponsors include RealPage and Greystar and is "the place where the leaders of the apartment industry come together to guide their future success" (its words) — hosts several events annually, including its in-person "Apartment Strategy Conference," "Annual Meeting," and "Fall Meeting," in cities including Las Vegas, NV, San Diego, CA, and Washington, DC.  In addition to hosting conferences, NMHC "tracks market conditions through NMHC member surveys" and "data from data provider partners" to provide "industry benchmarks" for data points such as rent per square foot and rent changes.

### CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the "Class," defined as:

> All persons and entities in the United States and its territories that are direct purchasers of multifamily residential real estate leases from a Lessor participating in RealPage's pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

Excluded from the Class are Defendants, Co-Conspirators, and their parent companies, subsidiaries and affiliates; also excluded are federal and state governmental agencies entities, instrumentalities, and subdivisions.

71.    Joinder of all proposed Class members is in a single action is impracticable because the class is so numerous: there are tens (if not hundreds) of thousands of members in the proposed Class.

72.    Plaintiff's claims are typical of those of the Class.

73.    Plaintiff and all members of the Class were all injured by the same illegal anticompetitive conduct that caused all of them to pay more for multifamily residential leases than

they otherwise would have in a competitive market.

74.    Plaintiff will fairly and adequately protect and represent the Class' interests.  Plaintiff's interests are not antagonistic to the Class.

75.    Questions of law and fact common to Class members will predominate over any questions that may be particular to individual class members because Defendants have acted and refused to act on grounds generally applicable to the Class.

76.    Such common questions of law and fact include:

    a.    Whether Defendants entered a contract, combination, conspiracy, or common understanding to artificially inflate prices for, and/or artificially suppress supply of, multifamily residential real estate leases from competitive levels;

    b.    Whether Defendants' conduct violates Section 1 of the Sherman Act;

    c.    Whether Defendants' conduct in fact artificially inflated prices for, and/or artificially suppressed supply of, multifamily residential real estate leases from competitive levels;

    d.    The measure of damages; and

    e.    The appropriate injunctive relief.

77.    Plaintiff's counsel is experienced and competent in the prosecution of consumer antitrust and unfair competition class actions.

78.    Class action treatment is the superior method for the fair and efficient adjudication of this controversy because, *inter alia*, it will allow a significant number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without unnecessarily expending court and litigant resources in numerous individual actions.  In sum, the benefits of proceeding as a class action—including providing a forum for claims that would not be practicable to pursue individually—substantially outweigh any case management difficulties that may arise in this class action.

## COUNT ONE

### (agreement in restraint of trade in violation of 15 U.S.C. § 1)

79.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

80.     Defendants formed a cartel to (*i*) artificially inflate the price of, and (*ii*) artificially decrease the supply and output of, multifamily residential real estate leases from competitive levels.

81.     The Defendants' cartel caused the Class to suffer overcharge damages.

82.     There are no procompetitive justifications for the Defendants' cartel.  Any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

83.     The Defendants' cartel is unlawful under a "per se" mode of analysis.  Alternatively, the cartel is unlawful under either a "quick look" or "rule of reason" analysis.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

A.  A determination, pursuant to Federal Rule of Civil Procedure 23, that this action may be maintained as a class action, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel;

B.  A determination that the conduct alleged herein is unlawful under Section 1 of the Sherman Act;

C.  Damages, to the maximum extent allowed, and a judgment in favor of Plaintiff and the Class and against Defendants jointly and severally in an amount to be trebled to the extent permitted;

D.  A judgment enjoining Defendants from engaging in further unlawful conduct;

E.  An award of attorneys' fees and costs;

F.  An award of pre- and post-judgment interest on all amounts awarded; and

G.  Such other relief as the Court deems just and equitable.

///

///

///

SCHNEIDER WALLACE COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400, Emeryville, CA 94608
Telephone: (415) 421-7100

**JURY DEMAND**

Plaintiff demands a jury trial on all claims so triable.


Dated: January 10, 2023

/s/ **Todd M. Schneider**

Todd M. Schneider
Matthew S. Weiler
J. Caleigh Macdonald
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell St., Ste. 1400
Emeryville, CA
Tel: (415) 421-7100
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com
jmacdonald@schneiderwallace.com

Peter B. Schneider (pro hac vice forthcoming)
3700 Buffalo Speedway, Suite 960
Houston, Texas 77098
Tel: (713) 338-2560
pschneider@schneiderwallace.com